Jeff JACOBS et al., Plaintiffs,

v.

The BOARD OF SCHOOL COMMISSIONERS OF the CITY OF INDIANAPOLIS et al., Defendants.

No. IP 72-C-263.

United States District Court,
S. D. Indiana,
Indianapolis Division.

Oct. 19, 1972.

Ronald E. Elberger, Craig E. Pinkus, and Richard G. Goetz, of Legal Services Organization, Indianapolis, Ind., for plaintiffs.

Lawrence McTurnan, of Bredell, Martin & McTurnan, Indianapolis, Ind., for defendants.

## ENTRY ON MOTION FOR PERMANENT INJUNCTION

STECKLER, Chief Judge.

This action is before the Court on the plaintiffs' motion for, among other things, an order against the defendants enjoining said defendants, their agents, servants, and employees, and all those in active concert and participation with them, from continuing to suppress and prohibit the distribution of the *Corn Cob Curtain*. Jurisdiction is based under Title 42, United States Code, Section 1983 and Title 28, United States Code, Sections 1343, 2201 and 2202.

On August 24–25, 1972, an evidentiary hearing was conducted. Oral argument was heard on the motion for temporary restraining order and the collateral issues raised by Defendants' Petition for Appointment of Guardian Ad Litem or Next Friend for Plaintiffs and All Members of the Class They Purport to Represent, and Petition of Defendants for an Order Requiring Plaintiffs' Attorney to Produce Authority Under Which He Appears. The Court denied defendants' motion to assign guardian ad litem, and granted defendants' motion for plaintiffs' attorney to show authority. Plaintiffs' attorney filed a memorandum in response to defendants' motions; the Court found that the regulations governing the services to be rendered by the Legal Services Organization and the persons whom it is to represent was not a matter for this Court to determine or fix, but rather if the defendants had a complaint, this was a matter to be taken up with the funding authorities and the organized bar. The Court found that plaintiffs' attorneys could proceed with representation. *See*, Hernandez v. Stockton Bd. of Education, 6 Clearinghouse C.R. 172 (July 1972); State ex rel. Koch v. Vanderburgh Probate Court, 246 Ind. 139, 203 N.E.2d 525 (1965).

The parties by counsel met in conference with the Court on September 27, 1972, and the defendants presented Resolutions 1033 and 1034 having been adopted by the Board of School Commissioners of the City of Indianapolis to amend Rules 11.05 and 11.06 of the Rules of the Board of School Commissioners, *i. e.*, the rules subject to complaint in this litigation. While these resolutions were under advisement for further consideration by the Court, the defendants filed Additional Paragraph of Answer with exhibits on October 12, 1972, with consent of plaintiffs; Exhibit A attached thereto replaced Resolution 1033 filed September 27, 1972, and Exhibit B was identical to Resolution 1034 filed September 27, 1972. [Hereinafter Exhibits A and B filed October 12, 1972, amending School Board Rules 11.05 and 11.06, will be referred to as Rules 11.05 and 11.06.]

Rules 11.05 and 11.06 subject to complaint in this litigation are as follows:

### Rule 11.05 [Exhibit A]

1. *General.* The following rules shall govern the distribution of literature and other communicatory material (hereinafter collectively referred to as 'literature') by students in the Indianapolis public school system (any of whom is hereinafter referred to as 'a student') in or upon the School Board's public school buildings, structures and/or grounds (the term 'school' being used, hereinafter, to signify any such building, structure or the grounds of any such building or structure).

1.1. *Distribution of Certain Kinds of Literature Prohibited.*

1.1.1. No student shall distribute in any school any literature that is—

1.1.1.1. obscene as to minors

1.1.1.2. libelous or

1.1.1.3. either by its content or by the manner of distribution itself, productive of, or likely to produce a significant disruption of the normal educational processes, functions or purposes in any of the Indianapolis schools, or injury to others.

1.1.1.4. not written by a student, teacher or other school employee; provided however, that advertisements

which are not in conflict with other provisions herein, and are reasonably and necessarily connected to the student publication itself shall be permitted.

1.1.2. Literature other than literature of the kind described in Section 1.-1.1. above, is hereinafter referred to as 'distributable literature.'

1.2. *Who May Distribute Distributable Literature.*

Subject to the provisions of Section 1.3. below, distributable literature may be distributed by, and only by, any student, within any school in which the student is regularly enrolled.

1.3. *Conditions Under Which Distributable Literature May Be Distributed.*

1.3.1. No distributable literature shall be distributed by any student in any school—

1.3.1.1. while classes are being conducted in the school in which the distribution is to be made;

1.3.1.2. in any place other than a place designated by the principal of the school in which the distribution is to be made, which place shall be selected by the principal with a view toward insuring that the proposed distribution will be made without interference with other persons lawfully within the school;

1.3.1.3. in such a way that the place of distribution (or any other part of the school in which the distribution is made) becomes littered;

1.3.1.4. in such a way that any person within the school can reasonably be made to feel that the distributable literature is being 'forced' upon him;

1.3.1.5. in immediate exchange for money or any other thing of value (or for an immediate promise of money or any other thing of value), whether the transaction is characterized as a sale of the distributable literature, as a contribution to finance the publication or distribution of the distributable literature, or as any other transaction whereunder money or any other thing of value (or a promise of either) immediately passes to

or for the direct or indirect benefit of the student who is distributing the distributable literature; or

1.3.1.6. unless the name of every person or organization that shall have participated in the publication of the distributable literature is plainly written in the distributable literature itself.

1.4. *Spirit in Which the Foregoing Regulations are to be Applied.*

In the application of the foregoing regulations pertaining to the distribution of literature in the schools by students, principals and other school administrators shall take care to insure that the constitutional and other legal rights of students to express themselves freely shall not be infringed. The spirit in which the regulations shall be applied shall not be a repressive one, but shall combine a respect for the rights of students with an appropriate regard for the maintenance in the schools of the kind of environment that is necessary to the School Board's conduct of its public educational mission in the School City of Indianapolis.

1.5. *Limitation of the Scope of the Foregoing Rules.*

The foregoing rules define the conditions under which students will be permitted to distribute literature in the schools. Nothing in those rules is intended to be, or is, or shall be construed as, an indication that the School Board will permit, without its express prior consent, the distribution in any school of any literature or other article by any person who is not a student in the school where the literature is to be distributed.

1.6. *Penalties for Violation and Student Rights of Review and Appeal.*

1.6.1. For violation of any of the provisions of this Rule 11.05 a student may be suspended or expelled by the principal of the school where such violation occurs and the principal or any teacher of the school may take other disciplinary action which is reasonably desirable or necessary to help any student,

to further school purposes, or to prevent any interference therewith.

1.6.2. In the event that suspension or expulsion is deemed necessary, the due process provision of public law 162 of the laws of the State of Indiana and the rules of this board adopted by Resolution #1030 shall apply.

1.7. *Severability of Rule.*

If any one or more sections, clauses or phrases of this Rule 11.05 shall be declared unconstitutional, such decision shall in no sense invalidate any other part of this act.

*Rule 11.06* [Exhibit B]

No person, including students and organizations or corporations, other than the school corporation acting through its designated agents, *or organizations of parents and teachers or students whose sole use of funds is for the benefit of the particular school in which they are organized or in attendance,* may sell merchandise or material, collect money, or solicit funds or contributions from the students for any cause or commercial activity within any school or on its campus.

The Seventh Circuit has held that students may commence actions seeking relief for infringement of their constitutional rights. Fujishima v. Bd. of Education, 460 F.2d 1355 (7th Cir. 1972); Scoville v. Bd. of Education of Joliet Tp. H. S. Dist. 204, etc., Ill., 425 F.2d 10 (7th Cir. 1970); Crews v. Cloncs, 432 F.2d 1259 (7th Cir. 1970).

In the instant case there can be no discomfort to strict constructionists who prefer their Constitution to be literal. No right is more clearly within the protection of the First Amendment, whose provisions Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), has now extended to the public school, than the freedom to distribute printed matter. Throughout our constitutional history, only three exceptions have been permitted to limit this freedom, and the exceptions themselves have been narrowly construed; these exceptions include obscenity, libel, and speech which constitutes a "clear and present danger." [In the context of the public school, the *Tinker* decision defined "clear and present danger" as that which "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." 393 U.S. 503 at 513, 89 S.Ct. 733 at 740.]

The interpretation of two of these three limitations, obscenity and to a lesser degree, "clear and present danger," provides the matrix for the controversy confronting this Court.

## PRIOR RESTRAINT AND PRIOR CENSORSHIP

In the recent Seventh Circuit case of *Fujishima, supra,* a blanket prior restraint similar to the one relied upon by defendants in the instant case was invalidated. The Court disposed of the matter saying:

"Because section 6–19 requires prior approval of publications, it is unconstitutional as a prior restraint in violation of the First Amendment. This conclusion is compelled by combining the holdings of Near v. Minnesota ex rel. Olson, 283 U.S. 697 [51 S. Ct. 625, 75 L.Ed. 1357] (1931), and Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503 [89 S.Ct. 733, 21 L.Ed.2d 731] (1969). *Tinker* held that, absent a showing of material and substantial interference with the requirements of school discipline, schools may not restrain the full First-Amendment rights of their students. *Near* established one of those rights, freedom to distribute a publication without prior censorship." [Footnote omitted.] *Fujishima,* 460 F.2d at 1357.

*Fujishima* recognized that a school district may lawfully establish a rule punishing students who publish and distribute on school grounds material which is obscene or libelous. *See also,* Sullivan v. Houston Independent School

District, 333 F.Supp. 1149, 1162–1167 (S.D.Tex.1971).

## OBSCENITY

Perhaps the major thrust of the defendants' attack concerns "obscenity." Obscenity was defined in Roth v. United States, 354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1957), in the following terms:

". . . whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest."

Mr. Justice Brennan, delivering the opinion of the Court in A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Massachusetts, 383 U.S. 413, 418, 86 S.Ct. 975, 977, 16 L.Ed.2d 1 (1966), stated:

"Under this definition [of obscenity], as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value."

Later, Mr. Justice Brennan discussed the power to employ variable concepts of obscenity in Ginsberg v. New York, 390 U.S. 629, 636, 88 S.Ct. 1274, 1278, 20 L. Ed.2d 195 (1968), and quoted the Court of Appeals of New York in Bookcase, Inc. v. Broderick, 18 N.Y.2d 71, 271 N. Y.S.2d 947, 952, 218 N.E.2d 668, 671 (1966):

"[M]aterial which is protected for distribution to adults is not necessarily constitutionally protected from restriction upon its dissemination to children. In other words, the concept of obscenity or of unprotected matter may vary according to the group to whom the questionable material is directed or from whom it is quarantined."

In determining whether future issues of the *Corn Cob Curtain* may be determined "obscene" pursuant to the three-pronged definition as applied to minors, two important limitations on the obscenity test must be remembered. First, the definition of "contemporary community standards" by which a work must be judged to determine its obscenity must necessarily be the community standards of the Indianapolis School District, not merely one school in said district. Second, in judging whether a publication of the *Corn Cob Curtain* is "obscene" according to legal standards laid down by the higher courts, the whole publication must be considered. As long ago as 1934 it was held that a publication must be considered as a whole in order to determine whether it is obscene. United States v. One Book Entitled "Ulysses" by James Joyce, 72 F.2d 705, 707 (2d Cir. 1934). *See*, Roth v. United States, *supra*. A federal court recently rejected the argument that an alleged obscene newspaper need not be judged as a whole, because it is merely a package of separate publications. United States v. Head, 317 F.Supp. 1138, 1143 (E.D.La.1970).

## BAN ON SALES

A further objection to the Board's regulations concerns the ban on sale of distributable literature. As presently constructed, Rule 11.05, Section 1.-3.1.5, would prevent many worthwhile fund raising projects on school grounds, for example, magazine sales by school band members or the often financially necessary sale of the "local school newspaper." Likewise, Rule 11.06 would prohibit fund raising for charities and other public service groups organized outside the school. Further, defendants would prohibit all sales of distributable literature, irrespective of "disruption." "Such a blanket proscription is not a legitimate exercise of the Board's power to regulate the 'time, place and manner' of distribution." Sullivan v. Houston Independent School District, *supra*, 333 F. Supp. at 1162.

■ Accordingly the Court concludes, and it is hereby ordered, that the named plaintiffs who are no longer students in a secondary school of the City of Indianapolis have no standing to sue in this cause. *See, consolidated appeals,* Passwater v. Myers, Steel v. Kuykendall, Monroe v. Eads, Nos. 71–1367, 71–1570, 71–1571 (7th Cir., September 15, 1972); Watkins v. Chicago Housing Authority, 406 F.2d 1234 (7th Cir. 1969). However, the remaining named plaintiffs are qualified as proper representatives of the class whose interest they seek to protect. Fujishima v. Bd. of Education, *supra.*

■ It is further ordered that the defendants, their successors in office, their agents, servants, and employees, and all those in active concert and participation with them are hereby permanently restrained and enjoined from the promulgation, maintenance and enforcement of any such rule, or portion thereof, found in this entry to be unconstitutional unless the following conditions are met:

(1) The rule must be specific as to places and times where possession and distribution of published materials are prohibited.

(2) The rule must be understandable to persons of the age and experience of covered students.

(3) The rule must not prohibit or inhibit conduct which is orderly, peaceful and reasonably quiet and which is not coercive of any other person's right to accept or reject any written material being distributed subject to the rule.

(4) The rule may prohibit such distribution at times and in places where normal classroom activity is being conducted. Such rule may not prohibit such distribution at other times and places unless such prohibition is necessary to prevent substantial and material interference with or delay of normal classroom activity or normal school function. As used herein, "normal classroom activity" means organized educational activity of students under the direct supervision of a teacher or a school administrator. Such phrase includes student activity in library areas, physical education classes, whether conducted indoors or outdoors, official assemblies and other similar gatherings. "Normal school function" means such activities as athletic contests, band concerts, school plays and scheduled on-campus lunch periods. Further, the peaceful, orderly, non-coercive distribution of written material before the commencement of classes in the morning and after the conclusion of classes in the afternoon by students lawfully on or off the premises of the school in which they are enrolled shall not be prohibited unless, under the circumstances, such distribution substantially and materially interferes with some normal classroom activity or normal school function as those phrases are hereinabove defined.

(5) The rule must not subject any covered student to the threat of discipline because of the reaction or response of any other person to the written material, provided, however, that defendants and their successors in office may prohibit, and punish, even to the extent of expulsion, for the publication or distribution of obscene material, hereinabove defined, or of libelous material for which a cause of action may exist in some person.

Sullivan v. Houston Independent School District, 333 F.Supp. 1149, 1152–1153 (S.D.Tex.1971).

For the hereinabove reasons and pursuant to the plaintiffs' prayer for relief, it is the further judgment of this Court that the following defendants' rules, or portions thereof, are unconstitutional and should be, and they are, hereby declared to be null and void:

■ Rule 11.05, in part, as follows:

Proviso 1.1.1.3, as being vague and overbroad. [The Court would suggest that the following would be

more apt to be constitutionally acceptable: ". . . either by its content or by the manner of distribution itself, productive of, or likely to produce a substandial and material interference with or delay of normal classroom activity or normal school function."]

Proviso 1.1.1.4, as requiring prior censorship. *See*, New York Times v. United States, 403 U.S. 713, 91 S. Ct. 2140, 29 L.Ed.2d 822 (1971); Near v. Minnesota ex rel. Olson, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931).

Proviso 1.3.1.1, as being overbroad and impermissible. *See*, Fujishima v. Bd. of Education, 460 F.2d 1355 (7th Cir. 1972); Sullivan v. Houston Independent School District, 333 F.Supp. 1149, 1152 (S.D.Tex.1971).

Proviso 1.3.1.5, as being vague, overbroad and impermissible. *See*, Sullivan v. Houston Independent School District, *supra* at 1162.

Proviso 1.3.1.6, as requiring prior censorship and restraint. *See*, Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Scoville v. Board of Ed. of Joliet Tp. H. S. Dist. 204, etc., Ill., 425 F.2d 10 (7th Cir. 1970).

Rule 11.06, in total, as being overbroad and impermissible.

*See*, Sullivan v. Houston Independent School District, *supra*, 333 F.Supp. at 1162.

 Further, this Court takes no action on the plaintiffs' request to expunge from their personal files any notations relating to this matter since no evidence was submitted indicating such a recordation.

 In addition, with respect to plaintiffs' request for compensatory damages, the Court finds that plaintiffs have not established sufficient data from which the Court can properly estimate the extent of the damages, if any. Such damages sought to be recovered

must be shown with reasonable certainty as to their nature and extent, and may not be based on mere speculation or conjecture. Bond v. Snyder Const. Co., 142 Ind.App. 325, 234 N.E.2d 659 (1968).

Finally, the costs of this action, excluding attorney fees, shall be taxed against the defendants.