John S. FORD, Plaintiff-Appellant,

Willie Cain et al., Plaintiffs,

v.

UNITED STATES STEEL CORPORATION, etc. et al., Defendants-Appellees.

No. 78–1246.

United States Court of Appeals,
Fifth Circuit.

March 2, 1981.

U. W. Clemon, Oscar W. Adams, Jr., Birmingham, Ala., Barry L. Goldstein, Washington, D.C., Jack Greenberg, New York City, for plaintiff-appellant.

Michael H. Gottesman, Robert M. Weinberg, Julia Penny Clark, Washington, D.C.,

Jerome A. Cooper, Birmingham, Ala., for U. S. Steelworkers.

Cooper, Mitch & Crawford, Birmingham, Ala., for U. S. Steelworkers, Etc., Local 1733 & Wm. Daniels.

Bernard Kleiman, Chicago, Ill., Carl B. Frankel, Pittsburgh, Pa., for U. S. Steel Corp.

Thomas, Taliaferro, Forman, Burr & Murray, James R. Forman, Jr., William K. Murray, Birmingham, Ala., for defendants-appellees.

Before HILL, KRAVITCH and THOMAS A. CLARK, Circuit Judges.

JAMES C. HILL, Circuit Judge:

These efforts to rectify the racially separate and unequal employment system at the massive Fairfield Works of the United States Steel Corporation began in the mid-1960s, shortly after the enactment of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Significant progress has been made, yet the litigation continues. Liability is no longer questioned, but issues of relief—specifically issues concerning the class status of some of those seeking relief—remain unresolved. This latest twist in the somewhat convoluted history of the class action aspects of this case arises from the district court's decertification, after an earlier remand, of a class which it had certified *sua sponte* at the conclusion of the trial. Explaining that the new "class had been formed with insufficient attention paid to the strictures of Fed.R.Civ.P. Rule 23," the district court dismissed the case. Although we agree that the requirements of Rule 23 may have been strained by the district court's certification of this class, we believe that the decertification of the class and dismissal of the case may work an injustice on those who may have relied on that certification. Consequently, we vacate

the order decertifying the class and dismissing the case, and instruct the district court: (1) to determine whether there is a class of persons who were encompassed by the "new" class and whose claims have not been litigated; (2) to determine whether or not the class includes persons who have a genuine controversy with defendants; (3) to indicate the scope of that class; and (4) if necessary, to name an appropriate class representative to supplant named plaintiff and class representative Ford.

## I.

When John Ford[1] first filed race discrimination charges against the United States Steel Corporation,[2] he purported to represent all "persons similarly situated who are employed by the United States Steel Corporation and its mills, plants, and/or other facilities located in the State of Alabama and in and around the City of Birmingham, and who are members of the United Steel Workers of America, AFL–CIO, and Local 1733 of the United Steel Workers of America, AFL–CIO ...." October 7, 1966 Complaint; Record at 2. Ford's complaint was one of three filed in 1966 against United States Steel alleging race discrimination at the Fairfield Works;[3] each complaint was brought on behalf of a class.[4] The district court, however, found that the complaints did "not sufficiently or properly define" the classes[5] and required that the complaints be amended. Consequently, the original Ford class was modified and restricted to "Negro persons similarly situated, who are employed in the Rail Transportation Department of the United States Steel Corporation ...." Amendment to the Complaint, September 29, 1967; Record at 13. These suits, along with a number of others including a government "pattern or practice" suit directed against the entire Fairfield Works,[6] were consoli-

1. There were in fact seven named plaintiffs; for convenience in this opinion, these plaintiffs will be referred to collectively as Ford.

2. Also named as defendants were the United Steelworkers of America, AFL–CIO, Local 1733 of that union, and Local 1733's president. Collective bargaining between United States Steel and the United Steelworkers produced the employment system challenged by Ford. Although the union represented employees throughout the Fairfield Works, fifteen separate locals represented employees in the nine divisions comprising the Works. See United States v. United States Steel Corp., 371 F.Supp. 1045, 1049–50 (N.D.Ala.1973). Ford originally sought only injunctive relief, but his complaint was later amended to include a claim for back pay.

3. The other two complaints were styled Hardy v. United States Steel Corp. and McKinstry v. United States Steel Corp. A short time later a fourth complaint was filed, Brown v. United States Steel Corp.

4. The Hardy, Ford, and McKinstry complaints were drafted by the same attorneys, and the class definitions in those complaints were similarly drawn. Paragraph II of the Hardy complaint, for example, stated that the action was being brought on behalf of all similarly situated persons employed by United States Steel at its Fairfield Works and who were members of Local 1489. Paragraph III(B) of the same complaint stated that class embraced only employees of the Stock House Department in the North Plant of the Fairfield Works. See Hardy v. United States Steel Corp., 289 F.Supp. 200, 202 (N.D.Ala.1967). It was not clear, then, whether the Hardy class included all similarly situated employees at the Fairfield Works or only those who worked in the Stock House Department. The Ford, McKinstry, and Brown complaints were likewise ambiguous. See id. at 202–203. The class actions were brought pursuant to Fed.R.Civ.P. 23(b)(2).

5. See id. The district court's opinions in Ford, McKinstry, and Brown are not reported but apparently echo the Hardy opinion. In fact, after recommending an appropriate class definition in Hardy, the district court said: "A class defined in such a manner in each of the four pending cases against the same employer will simplify and expedite the trial of these suits." Id. at 203.

6. In all, eight private actions were brought; six had been certified as class actions and involved 464 black production and maintenance employees at the Fairfield Works. The government "pattern or practice" suit, see 42 U.S.C. § 2000e–6, while not purporting to be a class action under Fed.R.Civ.P. 23, sought back pay for the approximately 2700 remaining black production and maintenance employees. See United States v. United States Steel Corp., 520 F.2d at 1047.

dated for trial. United States Steel was adjudged liable and injunctive relief was granted, but only three of the back pay claims, including Ford's, were successful.[7] Appeals were filed by the government and the other unsuccessful claimants.

Meanwhile, the government was in the process of negotiating a nation-wide employment discrimination consent decree with the steel industry.[8] *See United States v. Allegheny-Ludlum Industries, Inc.,* 517 F.2d 826 (5th Cir. 1975). The plaintiffs in the consent decree—the Equal Employment Opportunity Commission and the United States—stipulated that the settlements reached were remedially adequate to bring the steel industry into compliance with federal antidiscrimination law and to compensate individual employees for the past and continuing effects of the industry's discriminatory practices.[9] The government also agreed to proceed within the mechanics of the consent decree in lieu of seeking additional judgments. *Id.* at 838.

The district court correctly predicted that the government, in light of the nation-wide settlement, would withdraw its appeal from the district court's judgment in the pattern or practice suit. Recognizing that the vast majority of the black employees at Fairfield would thus be left without a representative,

the district court decided *sua sponte* to create a new class including those employees; this, the district court reasoned, would assure that the order denying back pay would be reviewed by the court of appeals. The creation of this new class was accomplished as a part of the final judgment in the consolidated cases. The district court named Ford class representative, despite the fact that Ford was, in the same judgment, found to have been successful in his claim for back pay. The court defined the new class as "all black persons who have at any time prior to January 1, 1973, been employed at the Fairfield Works (except to the extent they may be otherwise included as a class member [in one of the classes already certified])." May 2, 1973 Decree; Record at 128.

Ford, as representative of the new class, succeeded in having the adverse back pay ruling reversed.[10] The appellate court, however, instructed the district court to "carefully redetermine the propriety of the amorphous 'new' *Ford* class in light of the consequences of binding such a group to a final judgment." *United States v. United States Steel Corp.,* 520 F.2d at 1048. Thus, while it acted on the appeal by vacating the order denying back pay, the appellate court was uncomfortable with the "new" *Ford*

---

7. Thus only 61 employees, those included in the *Hardy, Ford,* and *McKinstry* classes, were awarded back pay; the denial of back pay in the other suits affected over 3000 black employees. The district court explained:

> The ultimate conclusion, simply, is that in the particular context of this case the assessment of back pay for the pre-1963 discrimination ... would be fraught with speculation and guess-work. What were problems in assessing back pay in the three situations in which the same was awarded are unsurmounted obstacles to the across-the-board claims for back pay generally. *United States v. United States Steel Corp.,* 571 F.Supp. 1061 (footnote omitted). There were additional reasons why the district court denied back pay, including United States Steel's lack of bad faith, absence of unjust enrichment to the company, and the scope of the injunctive relief.

8. United States Steel and the United Steelworkers participated in the negotiations and settlement.

9. The consent decree required the steel industry to tender back pay to all minority employees in production and maintenance units who were employed prior to January 1, 1968. Because no private individual as such was a party to the consent decree, individuals were not bound, by way of res judicata or estoppel by judgment, to its terms. Individuals could compromise their potential rights only by accepting the back pay tender and executing a release. *United States v. Allegheny-Ludlum Industries, Inc.,* 517 F.2d at 837–38.

10. Essentially, the appellate court held that the district court's reasons for denying back pay, *see* note 7 *supra,* were not valid under "a recent series of binding case law developments in this circuit and in the Supreme Court," *United States v. United States Steel Corp.,* 520 F.2d

class.[11] Additionally, it instructed the district court to address issues concerning the scope of Ford's standing.[12]

The district court, interpreting these instructions, stated that its "first task" was "to determine anew the extent, if any, to which [Ford] should, with respect to back pay claims, represent other blacks employed at Fairfield prior to January 1, 1973, who were not represented in other private class actions when the cases were tried in 1972." District Court's Memorandum Opinion, October 13, 1977; Record at 53. Conceding that its *sua sponte* class certification was an

"expediency" accomplished "with insufficient attention paid to the strictures of Fed.R.Civ.P. 23" and declaring that "the appellate court, in relieving the 'new' *Ford* class of the binding effect of a judgment adverse to it, also relieved this court from *being bound by its certification of that* class," *id.* at 55–56, the district concluded, "with some trepidation," that the class had been improperly formed and that Ford was an inappropriate class representative,[13] even though it recognized that its refusal "to accord class action status to any part of the 'new' Ford class would have the effect of

___

at 1048, which was not available to the district court at the time of the May 2, 1973 decree.

11. The appellate court was sensitive to both the reasons for creating the class and the problems caused by its creation:

> In a conscientious effort to eliminate multiplicitous litigation by binding the otherwise unrepresented employees to a Rule 23(a)(2) class judgment in which able counsel on both sides had vigorously and thoroughly litigated the issues, the district court created a class which it found in essence to be so diverse and unmanageable that the effects of unlawful discrimination could not be separated from other plausible, but not demonstrably unlawful, causes of members' reduced earnings.

*Id.* at 1050–51. The appellate court instructed the district court to "take evidence as to the propriety of the 'new' *Ford* class, its scope in terms of the ingredients of the judgment, if any, by which it ought to be bound, and its size and membership." *Id.* at 1051. Furthermore, the district court was to determine "the extent to which the 'new' *Ford* class is maintainable in a 'meaningful and manageable' sense as a class action seeking monetary relief." *Id.* (citing *Huff v. N.D. Cass Co.*, 485 F.2d 710 (5th Cir. 1973)). The appellate court provided the district court with additional instructions to be followed "[i]f the district court again concludes that the 'new' *Ford* class action should go forward . . . ." *Id.*

12. Although the appellate court stated that it rejected the argument "that appellant Ford lacks standing as a matter of law to represent any class of black employees broader than the 'original' *Ford* class, in which his personal back pay claim has been satisfied . . . ," *id.* at 1052, it did instruct the district court to reexamine Ford's status as representative of the new class and to address matters concerning the "scope of Mr. Ford's standing" and "the adequacy of the representation . . . ." *Id.* at 1051–52.

13. The district court considered a number of arguments against maintaining the class action. For example, it rejected the argument, made by both United States Steel and the United Steelworkers, that Ford could not be an adequate class representative under Fed.R.Civ.P. 23(a)(4) because he had already obtained relief on all personal claims. Additionally, although the district court agreed with the defendants' contention that Ford was never a member of the new class—because the new class was defined in such a manner as to exclude those who were members of the original class—it felt that was not dispositive of the class action issue, "for it would be but a simple matter to redefine the class so that it was composed of both the 'original' and the 'new' Ford classes." District Court's Memorandum of Opinion, October 13, 1977; Record at 57. The district court based its decision that the class was improper upon its conclusion that Ford lacked the necessary nexus with the new class to be included as one of its members. In support of this conclusion, the district court pointed out (1) that Ford was an employee of one of three departments in one of nine plants of the company and his complaint was limited to specific employment practices at that department, while the members of the new class were employed at the eight other plants and were represented by eleven other local unions, and (2) that Ford never purported to be a member of such a class, never complained about practices affecting such a class, and never named as defendants the other local unions. The district court stated that even though all of the persons involved "are of the same race, are employees of the same company, are members of the same international union, have complained of discrimination in connection with seniority systems, and are—or may be—sympathetic to each others' cause, [this] is simply not sufficient to constitute a rational class nexus . . . ." *Id.* at 59.

terminating the action as a whole." [14] *Id.* at 53. Final judgment dismissing the suit was entered on October 13, 1977.

The dismissal prompted a flurry of legal activity; motions to intervene [15] and to alter or amend the judgment were filed with the court. Ford's motion to alter or amend was denied because no new significant evidence was brought to the district court's attention. The motion to intervene was denied because (1) the district court ruled it untimely under *Stallworth v. Monsanto Co.*, 558 F.2d 257 (5th Cir. 1977) [16] and (2) intervention would have been denied by the district court under Fed.R.Civ.P. 24(b)(2) even if it had been timely. [17]

The present appeal is from the district court's dismissal of the suit. Although only Ford has appealed, we have been asked to consider issues concerning the would-be intervenors as well.

## II.

Recently we have received considerable instruction from the Supreme Court relevant to class actions and the Article III "case or controversy" jurisdictional requirement. Of particular interest is *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 100 S.Ct. 388, 63 L.Ed.2d 479 (1980). *Geraghty* does not answer all our questions—in fact, the single question *Geraghty* clearly answers is not at issue here—but it does give us direction. Geraghty, a federal prisoner whose parole application had been denied, challenged recently promulgated parole release guidelines on behalf of "all federal prisoners who are or will become eligible for release on parole." *Id.* at 393, 100 S.Ct. at 1206. The district court denied class certification and ruled against Geraghty on his individual claims. Geraghty appealed. Meanwhile, another prisoner who, like Geraghty, had been denied parole through application of the guidelines sought to intervene "to ensure that the legal issue raised by Geraghty on behalf of the class '[would] not escape review ....'" *Id.* at 394, 100 S.Ct. at 1207. Intervention too was denied, and all appeals were consolidated. Before appellate briefs were filed,

---

**14.** Although the district court apparently did not consider the issue dispositive, it did maintain that

> a small percentage of the 'new' Ford class are putative class members at this date, over 95% having accepted back pay and signed releases under the consent decree involving the steel industry .... Even so, there remain many who, no doubt, have been anticipating a favorable ruling from this court and who may, indeed, have declined back pay under the industry settlement based on such anticipation .... Whether, in the interest of justice, this court, in its capacity as overseer of the steel industry settlement, should on motion require a re-tender as a result of this decision need not be answered now.

*Id.* at 59–60 & n.9.

**15.** Thirty-four persons sought to intervene "on behalf of themselves and others similarly situated, members of the 'new' Ford class ...." Motion for Leave to Intervene, October 25, 1977; Record at 64. They asserted

> that they have an interest in the transactions which are the subject of this action; and that they are so situated that the disposition of the action may as a practical matter impair or impede their ability to protect that interest. Based on this Court's final judgment herein dated October 13, 1977, the interests of these applicants are not adequately repre-

> sented by the existing parties to the litigation.

*Id.* These interveners were among those who had not accepted the back pay tender provided under the nation-wide settlement.

**16.** *Stallworth* identified four factors for consideration: (1) the length of time during which the would-be intervenors actually knew or reasonably should have known of their interest in the case before they petitioned for leave to intervene; (2) the extent of prejudice to the existing parties if intervention is allowed; (3) the extent of prejudice which the would-be intervenors may suffer if intervention is denied; and (4) the existence of unusual circumstances militating either for or against a determination that intervention is timely. The district court found that factors 1, 3, and 4 weighed against intervention. Memorandum of Opinion, December 20, 1977; Record at 73–81.

**17.** The district court concluded that, while the threshold requirement for intervention under Fed.R.Civ.P. 24(b)(2)—that there be a common question of law or fact—would have been satisfied, such intervention was nevertheless discretionary, and the court would have denied intervention because it would have unduly delayed the adjudication of the rights of the original parties. *Id.*

however, Geraghty completed his sentence and was mandatorily released. The Parole Commissioner moved to dismiss the appeals as moot.

Earlier cases had permitted a named plaintiff to continue to represent a class even though he had lost on individual claims, as long as the class had been certified. *See, e.g., Franks v. Bowman Trans-*

portation Co., Inc., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); [18] *see also Board of School Comm'rs v. Jacobs*, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975); *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975).[19] In *Geraghty* the Court took another step and held that Geraghty "was a proper representative for the purpose of appealing the ruling denying certification of the class ...," *Geraghty*,

18. *Bowman* was a Title VII class action. The relief sought included hiring and back pay. The sole named plaintiff, Lee, was successful in his claims for employment and back pay, but was subsequently properly discharged. Thus Lee was not eligible for any of the relief sought in the class action. Nevertheless, the Court permitted the class action to go forward with Lee as its representative. The Court found that "[t]here can be no question that this certified class action 'clearly presented' the ... Court ... 'with a case or controversy in every sense contemplated by Art. III of the Constitution.'" *Franks v. Bowman Transportation Co., Inc.*, 424 U.S. at 755, 96 S.Ct. at 1259 (quoting *Sosna v. Iowa*, 419 U.S. 393, 398, 95 S.Ct. 553, 556, 42 L.Ed.2d 532 (1975)). The Court went on to explain that "[t]he unnamed members of the class are entitled to ... relief ... and thus to that extent have 'such a personal stake in the outcome of the controversy ... as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult ... questions.'" *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). Thus *Bowman* seems to affirm the proposition that a class, once certified, has an independent and adequate stake in the action to survive the apparent mootness of the named plaintiff's claims, and to satisfy the "live controversy" requirement of Article III.

19. In *Sosna* the plaintiff challenged, on constitutional grounds, state statutory residency requirements for divorce. A class was properly certified, and injunctive and declaratory relief was requested. By the time the case reached the Supreme Court, the plaintiff had long since satisfied the durational residency requirements and, in any event, had obtained a divorce in another state. The Supreme Court said:

> If appellant had sued only on her own behalf, both the fact that she now satisfies the one-year residency requirement and the fact that she has obtained a divorce elsewhere would make this case moot and require dismissal .... But appellant brought this suit as a class action and sought to litigate the constitutionality of the durational residency requirement in a representative capacity. When the District Court certified the propriety of the class action, the class of unnamed

persons described in the certification acquired a legal status separate from the interest asserted by appellant.

*Sosna v. Iowa*, 419 U.S. at 399, 95 S.Ct. at 557 (citations and footnote omitted). Thus *Sosna* indicates that a certified class is a separate entity that survives a subsequently mooted named plaintiff. The Supreme Court went on to define the boundaries of this axiom:

> There must not only be a named plaintiff who has such a case or controversy at the time the complaint is filed, and at the time the class action is certified by the District Court pursuant to Rule 23, but there must be a live controversy at the time this court reviews the case .... The controversy may exist, however, between a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot.

*Id.* at 402, 95 S.Ct. at 559 (citations and footnote omitted). The Court concluded that, although the controversy with the named plaintiff was no longer "live," it remained very much alive for the class of persons she had been certified to represent.

The limits of the *Sosna* holding were clarified by *Board of School Comm'rs v. Jacobs*, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975). The *Jacobs* plaintiffs were high school students challenging school rules and actions they claimed interfered with their constitutional right to publish a school newspaper. The plaintiffs prevailed on the merits in both the district and appellate courts, but the Supreme Court reversed, finding that the named plaintiffs had graduated and thus the case was moot. The Supreme Court noted that, although the district court had stated that " 'the remaining named plaintiffs are qualified as proper representatives of the class whose interest they seek to protect,' " *id.* at 130, 95 S.Ct. at 850 (quoting *Jacobs v. Board of School Comm'rs*, 349 F.Supp. 605, 611 (S.D.Ind.1972)), no class had been properly identified or certified. Thus, while the Supreme Court repeated the *Sosna* principle that a duly certified class can survive a mooted named plaintiff's claim, it emphasized that compliance with the requirements of Rule 23, particularly in identifying a class, was crucial. *See Sannon v. United States*, 631 F.2d 1247 (5th Cir. 1980).

445 U.S. at 407, 100 S.Ct. at 1214, despite the fact that no class had been certified and that Geraghty had been released and was no longer subject to the challenged parole release guidelines.

In the present case, Ford's capacity to appeal the class decertification is not at issue;[20] thus the narrow holding in *Geraghty* is not germane. Nevertheless, the Supreme Court's rationale leading to the *Geraghty* holding is instructive. The "case or controversy" requirement, the Court reasoned, has two facets: there must be (1) a continuing "live" controversy and (2) a presence in any party of some legally cognizable interest in the outcome of the case (the "personal stake" requirement). The Court found evidence of a "live" controversy between the Parole Commission "and at least some members of the class [Geraghty] seeks to represent" in "the fact that prisoners currently affected by the guidelines have moved to be substituted, or to intervene, as 'named' respondents in this Court." *Id.* 445 U.S. at 396, 100 S.Ct. at 1208. The same situation exists in the present case: members of the class certified by the district court in its May 2, 1973 Decree sought to intervene, or to be substituted, when the district court adjudged Ford an improper class representative and decertified the class in its October 13, 1977 Order. The district court denied those motions to intervene, as did the district court in *Geraghty*, and we do not intend to reverse that order as such; indeed, the intervenors themselves have not appealed. However, in determining whether there is a class of persons whose claims have not been litigated and who have a genuine controversy with the defendants, the district court should not overlook the fact that, in response to its order dismissing the class because it found Ford himself an inappropriate class representative, others did come forward.

We recognize that the district court dismissed this action not because Ford's claim had expired, *see United States Parole Comm'n v. Geraghty*, 445 U.S. at 404, 100 S.Ct. at 1212, had become moot, *see generally Board of School Comm'rs v. Jacobs*, 420 U.S. at 129, 95 S.Ct. at 849, or had been adjudicated, *see Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980). Rather, the district court decertified this class and dismissed this case because it found that Ford lacked the proper nexus with the class to be its representative. In essence, then, this case was dismissed because the district court concluded that its *sua sponte* class certification itself had been improper, that the "class had been formed with insufficient attention paid to the strictures of Fed.R. Civ.P. Rule 23." October 13, 1977 Memorandum of Opinion; Record at 56. Nevertheless, the fatal defect, according to the district court, was in the naming of the class representative; the district court did not suggest that there was not at least a potentially proper class. This leads us to a discussion of the second part of the district court's task on remand: if the district court concludes that the "new" class encompassed persons whose claims have not been litigated and who have a genuine controversy with the defendants, the district court must determine the scope of that class. Of central concern are those who may have relied on the district court's certification of the new class in May, 1973; some may not have acted to protect their interests, believing that they were properly and adequately represented by Ford.

The district court is in the best position to determine who, if anyone, may have been adversely affected by the certification and

20. In its October 13, 1977 Memorandum of Opinion, the district court stated:

The defendants argue that having already obtained relief on all personal claims, John Ford ... cannot be an adequate class representative under Rule 23(a)(4). If narrowly viewed as a contention that one who during litigation prevails (or loses) on individual claims cannot thereafter serve as a class representative, the contention must be rejected. *See, e.g., Jenkins v. United Gas Corp.*, 400 F.2d 28 (CA5 1968); *Huff v. N. D. Cass. Co.*, 485 F.2d 710 (CA5 1973); *Long v. Sapp*, 502 F.2d 34 (CA5 1974). *But cf. McLaughlin v. Hoffman*, 547 F.2d 918, n.4 (CA5 1977).

Memorandum of Opinion, October 13, 1977. Record at 56–57.

the decertification of the class. We are admittedly confused by the various assertions of the parties before us regarding those who may yet have an interest in this litigation. The class certified in May, 1973 embraced all black employees at the Fairfield Works, except those included in the already certified classes, who had been employed prior to January 1, 1973. Prior to that, only the government, in its practice or pattern suit, purported to present back pay claims on behalf of black employees generally throughout the Fairfield Works. The government suit was neither designated nor certified a class action, and thus it would have had none of the binding affects of a class action. Yet it seems to us that only after the government withdrew its appeal in that suit—after the nation-wide settlement—were black employees generally left without representation at all. The prospect of this discontinuance of representation was the reason behind the court's certification of the class in May, 1973.

The nation-wide settlement itself must be taken into consideration. It appears that the interests of those who have accepted the tender and signed releases have been satisfied. There are some, however, such as the would-be intervenors, who had not, when they moved to intervene, chosen to accept the tender but rather chose to advance their claims in court. More importantly, it is apparent that there may be some who were ostensible members of the class certified in May, 1973 who are not eligible for tender under the settlement.[21] Such factors, we think, merit consideration.

Even then the district court's task will not be finished. If the district court determines that there is an appropriate class with a "live" controversy, one question remains: who should litigate it? The district court has concluded that Ford should not. We do not overrule that conclusion,[22] but suggest that dismissal of the case may nevertheless have been inappropriate. *Geraghty* at least implies that if a "live" controversy exists, the district court has the responsibility of determining who is an appropriate representative. *See United States Parole Comm'n v. Geraghty*, 445 U.S. at 407, 100 S.Ct. at 1214 ("Upon remand, the District Court can determine whether Geraghty may continue to press the class claims or whether another representative would be appropriate.") Our instructions echo the order entered in *Armour v. City of Anniston*, 622 F.2d 1226 (5th Cir. 1980), after that case had been vacated and remanded for further consideration in light

21. The record before us is somewhat sketchy, but it seems that the class certified on May 2, embracing blacks employed prior to January 1, 1973, is substantially different from the classes of employees eligible to receive back pay under the settlement, embracing "minority ... employees in Production and Maintenance units who were employed prior to January 1, 1968 ...." *See United States v. Allegheny-Ludlum Industries, Inc.*, 517 F.2d at 835 n.4.

22. The district court supported its conclusion that Ford lacks the necessary nexus with the purported class to serve as its representative on the strength of *Satterwhite v. City of Greenville*, 557 F.2d 414 (5th Cir. 1980). *See* Memorandum of Opinion October 13, 1977; Record at 57. *Satterwhite* has since been vacated and remanded for further consideration in light of *Geraghty* and *Roper*. *Satterwhite v. City of Greenville*, 445 U.S. 940, 100 S.Ct. 1334, 63 L.Ed.2d 773 (1980). Nevertheless, the district court's reliance on *Satterwhite* focuses on that decision's interpretation of *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). The basic holding in *Rodriguez*—that "a class representa-

tive must be part of the class and 'possess the same interest and suffer the same injury' as the class members," *id.* at 403, 97 S.Ct. at 1896—is still good law; indeed, the Court does not mention *Rodriguez* in either its *Geraghty* or *Roper* opinions. The facts in *Rodriguez*, however, are quite different from the ones here. For example, in *Rodriguez*, the district court concluded that the named plaintiffs had not in fact been injured by the alleged discriminatory practices and thus were not members of the class of discriminates they purported to represent; the named plaintiffs here prevailed on their claims of discrimination. Furthermore, there were strong indications that the representations by the *Rodriguez* plaintiffs were inadequate; the representation by the plaintiffs here seems to be exemplary. Finally, it was apparent in *Rodriguez* that there was a conflict between the interests of the purported class members and the interests of the named plaintiffs as delineated in their complaint; no such conflict is in evidence here. *See id.* at 403–405, 97 S.Ct. at 1896–1897.

of, *inter alia, Geraghty (see Armour v. City of Anniston*, 445 U.S. 940, 100 S.Ct. 1334, 63 L.Ed.2d 774 (1980)):

> [T]he case is remanded to the district court to determine, after such hearing or hearings as it may see fit, whether or not there is still a live controversy involving the proposed class, and, if so, whether or not Mrs. Armour is a proper class representative, and, if she is not, to substitute an appropriate class representative should one desire to be appointed.

In conclusion, we emphasize that the task of the district court on remand is not one which courts must always undertake when confronted with potential class actions. The unusual procedural history of the class action aspects of this case—marked most notably by the district court's *sua sponte* certification of a class it saw fit to decertify over four years later—dictates further consideration to ensure that those, if any, who are entitled to relief receive it. Accordingly, the district court's order is

VACATED and the case is REMANDED for further consideration consistent with this opinion.[23]

---

**23.** In light of our disposition, it is unnecessary to consider other arguments raised, by both plaintiffs and defendants, on appeal.